**A–1 CIGARETTE VENDING, INC., et al.,**

v.

**The UNITED STATES**

No. 97–848C.

United States Court of Federal Claims.

May 10, 2001.

Douglas B. McFadden, Washington, DC, for plaintiffs. John M. Shoreman, of counsel.

Mark A. Melnick, Washington, D.C., with whom was Assistant Attorney General David W. Ogden for the defendant. Katherine M. Kelly, Department of Justice; Margaret Jane Porter and Karen E. Schifter, Food and Drug Administration; and Karen Wagner, Department of Health and Human Services, of counsel.

## OPINION

YOCK, Senior Judge.

Plaintiffs, A–1 Cigarette Vending, Inc., *et al.* ("plaintiffs"), representing several tobacco vending machine owner/operators,[1] filed a Complaint against the United States ("defendant"), alleging that the Food and Drug Administration ("FDA" or the "agency") effected a temporary regulatory taking upon plaintiffs by promulgating certain tobacco regulations that were to ban the sale of cigarettes and smokeless tobacco from most vending machines. The FDA's tobacco regulations subsequently were held unauthorized and invalid by the United States Supreme Court in *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000). This matter is now before the Court on the defendant's Partial Motion to Dismiss. For the reasons set forth herein, the defendant's Partial Motion to Dismiss is GRANTED.

### Background

The plaintiffs allegedly own and operate tobacco vending machine businesses. Amended Complaint (Am.Compl.) ¶ 2. According to the plaintiffs' Amended Complaint, the vendors locate tobacco vending machines in public facilities pursuant to placement contracts with the facility owners. *Id.* The plaintiffs assert that they earn reve-

---

1. On March 25, 1998, by Order of this Court, Case Nos. 98–208C, 98–209C, 98–210C, 98–211C, 98–212C, 98–213C, 98–214C, 98–215C, 98–216C, 98–217C, 98–218C, 98–219C, 98–220C, 98–221C, 98–222C, 98–223C, 98–224C, 98–225C, 98–226C, 98–227C, 98–228C, 98–229C, 98–230C, 98–231C, 98–232C, 98–233C, 98–234C, 98–235C, 98–236C, 98–237C, 98–238C, 98–239C, 98–240C, 98–241C, 98–242C, 98–243C, 98–244C, 98–245C, 98–246C, 98–247C, 98–248C, 98–249C, 98–250C, 98–251C, 98–252C, 98–253C, 98–254C, 98–255C, 98–256C, 98–257C, 98–258C, 98–259C, 98–260C, 98–261C, 98–262C, 98–263C, 98–264C, 98–265C, 98–266C, 98–267C, 98–268C, 98–269C, 98–270C, 98–271C, 98–272C, 98–273C, 98–274C, 98–275C, 98–276C, 98–277C, 98–278C, 98–279C, 98–280C, 98–281C, 98–282C, 98–283C, 98–284C, 98–285C, 98–286C, 98–287C, 98–288C, 98–289C, 98–290C, 98–291C, 98–292C, 98–293C, 98–294C, 98–295C, 98–296C, 98–297C, 98–298C, 98–299C, 98–300C, 98–301C, 98–302C, 98–303; 98–508C, and 98–600C were all consolidated with the present case, No. 97–848C, for the purposes of pretrial motions common to all. Accordingly, this Opinion shall be deemed to apply to all of the aforementioned consolidated cases.

nue through the sale of cigarettes and tobacco products dispensed from their machines and through commissions paid by manufacturers to stock certain brands in the plaintiffs' machines. *Id.*

On August 11, 1995, the FDA issued proposed regulations "Restricting the Sale and Distribution of Cigarettes and Smokeless Tobacco Products To Protect Children and Adolescents," and an analysis of the agency's jurisdiction over such tobacco products. 60 Fed.Reg. 41,314, 41,453 (1995). The agency asserted that the objective of these proposed regulations was "to reduce the death and disease caused by tobacco products" by "preventing future generations from developing an addiction to nicotine-containing tobacco products." *Id.* at 41,314. The proposed regulations suggested various labeling requirements, promotional and advertising restrictions, and access restrictions to meet this objective. *Id.* at 41,315. Specifically, the agency proposed to "restrict the sale of cigarettes and smokeless tobacco products to individuals age 18 and older," and to "require retailers to verify the age of persons who wish to buy cigarettes or smokeless tobacco products * * *." *Id.* The FDA further proposed to completely "eliminate 'impersonal' methods of sale that do not readily allow age verification, such as mail orders, self-service displays, and vending machines." *Id.*

After receiving comments on the proposed regulations, the FDA published the final tobacco regulations on August 28, 1996. 61 Fed.Reg. 44,396 (1996) (codified at 21 C.F.R. pts. 801, 803, 804, 807, 820, and 897 (1997)). The final regulations contained specific labeling requirements,[2] promotional and advertising restrictions,[3] and access restrictions.[4] A portion of the final access restriction regulations barred the sale of cigarettes or smokeless tobacco to anyone younger than 18 years of age and required retailers to verify a prospective purchaser's age by means of photographic identification. 21 C.F.R. § 897.14(a)-(b). These age and identification requirements became effective on February 28, 1997. *Id.* pt. 897 note.

The final regulations also contained certain restrictions on the sale of tobacco products from vending machines. Rather than banning the sale of cigarettes and smokeless tobacco from vending machines outright (as had been suggested by the proposed regulations), the final regulations merely limited the sale of tobacco products from vending machines to locations where no one under the age of 18 was present or allowed to enter at any time. 21 C.F.R. §§ 897.14(c), 897 .16(c). These regulations provided, in pertinent part:

*Vending machines, self-service displays, mail-order sales, and other "impersonal" modes of sale.*

(1) Except as otherwise provided under this section, a retailer may sell cigarettes and smokeless tobacco only in a direct, face-to-face exchange between the retailer and the consumer. Examples of methods of sale that are not permitted include vending machines and self-service displays.

(2) Exceptions. The following methods of sale are permitted:

(i) Mail-order sales, excluding mail-order redemption of coupons and distribution of free samples through the mail; and

(ii) Vending machines (including vending machines that sell packaged, single cigarettes) and self-service displays that are located in facilities where the retailer ensures that no

---

2. The labeling regulations mandated that cigarette and smokeless tobacco packages bear the established name of the product and a statement of intended use/age restriction. 21 C.F.R. §§ 897.24–.25.

3. The FDA limited certain tobacco advertising to a text-only, black and white format; restricted the use of trade or brand name for tobacco products; and prohibited the use of a tobacco product brand name in connection with the sale or distribution of nontobacco promotional material and the sponsorship of sporting or other recreational events. 21 C.F.R. §§ 897.30, .32, .34.

4. In addition to the provisions discussed hereafter, the access restriction regulations prohibited the sale of cigarette packages containing fewer than 20 cigarettes and forbade the distribution of any free samples of cigarettes or smokeless tobacco. 21 C.F.R. §§ 897.16(b), (d).

person younger than 18 years of age is present, or permitted to enter, at any time.

21 C.F.R. § 897.16(c).

The vending machine regulations were scheduled to go into effect on August 28, 1997. *Id.* pt. 897 note.

In response to the FDA's final tobacco regulations, various tobacco companies, advertisers, and retailers brought suit against the FDA in the United States District Court for the Middle District of North Carolina, challenging the agency's authority to regulate tobacco under the Federal Food, Drug and Cosmetics Act ("FDCA"), Pub.L. No. 75–717, 52 Stat. 1040 (1938) (codified as amended 21 U.S.C. §§ 301 *et seq.* (1994)). *See Coyne Beahm, Inc. v. FDA,* 966 F.Supp. 1374 (M.D.N.C.1997). On April 25, 1997, the district court struck down the regulations restricting the advertising and promotion of tobacco products but upheld the FDA's authority to issue the access restriction regulations (including the age/identification requirements and the vending machine regulations).[5] *Id.* at 1400. Nevertheless, the court ordered that the FDA "shall not implement any of the additional Regulations set for implementation on August 28, 1997, pending further orders by the court." *Id.* at 1400–01. The tobacco vending machine restrictions were among the regulations covered by this stay. The defendant has asserted that the FDA respected the district court's order on a nationwide basis. Defendant's Partial Motion to Dismiss (Def.'s Partial Mot. to Dismiss) at 14–17; Kirchner Decl. ¶ 6.

On August 14, 1998, the United States Court of Appeals for the Fourth Circuit issued an opinion reversing the *Coyne Beahm* decision, reasoning that the FDA was not authorized to regulate tobacco products under the FDCA. *Brown & Williamson Tobacco Corp. v. FDA,* 153 F.3d 155, 176 (4th Cir.1998). The United States Supreme Court granted *certiorari* on April 26, 1999. *FDA v. Brown & Williamson Tobacco Corp.,* 526 U.S. 1086, 119 S.Ct. 1495, 143 L.Ed.2d 650 (1999). Finally, on March 21, 2000, the Supreme Court affirmed the judgment of the Fourth Circuit, holding that the FDA's tobacco regulations were not authorized by Congress and, therefore, were invalid. *FDA v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000).

In the meantime, on December 15, 1997, the plaintiffs had filed a Complaint with this Court, claiming that the FDA's tobacco vending machine regulations had effected a permanent taking of plaintiffs' property. Compl. ¶ 1. The plaintiffs' case was stayed by this Court in its Order of April 21, 1998, pending the decision of the Fourth Circuit in *Brown & Williamson.* This stay subsequently was extended by Order of November 25, 1998, until all appeals were completed and a final decision was reached in the *Brown & Williamson* case. On May 18, 2000, after the Supreme Court's final decision in *Brown & Williamson,* 529 U.S. 120, 120 S.Ct. 1291, 146 L.Ed.2d 121, this Court lifted its stay and, responding to a request from the plaintiffs, ordered the plaintiffs to file an amended complaint by June 5, 2000. On May 25, 2000, the plaintiffs filed their Amended Complaint with this Court, asserting two separate counts. Count I of the Amended Complaint asserted a temporary taking claim based on the FDA's tobacco regulations and the agency's alleged public campaign against the plaintiffs.[6] Am. Compl.

---

5. The district court also upheld the FDA's authority to issue certain labeling requirements for cigarettes and smokeless tobacco. The labeling regulations, however, are not at issue in the present case.

6. Plaintiffs have been inconsistent as to their position on when the alleged temporary taking began. In Plaintiffs' Brief in Opposition to Defendant's Partial Motion to Dismiss, the plaintiffs' alleged, contrary to the Amended Complaint, that the temporary taking began on August 11, 1995 (the date that the FDA issued the proposed tobacco regulations), but then added that this case involves "an erosion or creeping taking by the Government" that actually started on March 31, 1993, with the promulgation of the HHS regulations discussed in Count II. Pls.' Opp'n Br. at 7–8. Because Count II has been previously dismissed by this Court, *see infra* pp. 7–8, but in order to afford the broadest consideration of plaintiffs' possible claims, this Court will treat the alleged temporary taking as beginning in 1994, consis-

¶¶ 19–23. The alleged time frame of this temporary taking began in 1994 with the FDA's purported "public campaign against the Plaintiffs," continued with the agency's announcement of proposed tobacco regulations on August 11, 1995 and final tobacco regulations on August 28, 1996, and ended on March 21, 2000, the date that the regulations were declared invalid by the Supreme Court. Am. Compl. ¶¶ 21. Count II of the Amended Complaint asserted a taking claim based on the United States Department of Health and Human Services' (HHS's) implementation of the Alcohol, Drug Abuse and Mental Health Reorganization Act, Pub.L. No. 102–321, 106 Stat. 323 (1992) (codified at 42 U.S.C. §§ 300x–21, 300x–26 (1994)). Am. Compl. ¶ 24–30. More specifically, plaintiffs alleged in Count II that the various states were acting as agents of the Federal Government in restricting the sale of tobacco products from vending machines in order to obtain block grants from HHS. This Court dismissed this so-called state action argument in a related case, *B & G Enterprises v. United States*, 43 Fed.Cl. 523 (1999), *aff'd*, 220 F.3d 1318 (Fed.Cir.2000), *cert. denied*, 121 S.Ct. 1079, 148 L.Ed.2d 956 (2001), and, as a result, proceedings in this case with respect to Count II of the Amended Complaint were stayed pending the final disposition of any and all appeals in *B & G Enterprises*. On February 20, 2001, the Supreme Court denied *certiorari* in *B & G Enterprises*, and on February 22, 2001 the plaintiffs moved this Court to dismiss Count II. Accordingly, Count II of the Amended Complaint was dismissed by Order of March 2, 2001.[7] At present, only Count I remains before this Court.

On August 3, 2000, the defendant filed Defendant's Partial Motion to Dismiss. The defendant argued that Count I of the Amended Complaint must be dismissed because: (a) the Supreme Court's holding in *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 120 S.Ct. 1291, 146 L.Ed.2d 121, that the FDA did not possess regulatory authority over tobacco products, precluded plaintiffs' recovery; (b) the mere consideration of a regulation, short of implementation, is not a taking, and the FDA never implemented the vending machine regulation; and (c) there was no taking as a matter of law. The plaintiffs filed their Opposition Brief (Pls.' Opp'n Br.) on December 5, 2001,[8] and the defendant responded on January 4, 2000.

---

tent with the Amended Complaint. *See* Am. Compl. ¶ 21.

7. This Court subsequently extended the dismissal of Count II to several other cases that had been consolidated with this case for the purposes of pretrial motions common to all. *See* Order of March 15, 2001 (dismissing Count II in Case Nos. 98–208C, 98–209C, 98–210C, 98–211C, 98–212C, 98–213C, 98–214C, 98–215C, 98–216C, 98–217C, 98–218C, 98–219C, 98–220C, 98–221C, 98–222C, 98–223C, 98–224C, 98–225C, 98–226C, 98–227C, 98–228C, 98–229C, 98–230C, 98–231C, 98–232C, 98–233C, 98–234C, 98–235C, 98–236C, 98–237C, 98–238C, 98–239C, 98–240C, 98–241C, 98–242C, 98–243C, 98–244C, 98–245C, 98–246C, 98–247C, 98–248C, 98–249C, 98–250C, 98–251C, 98–252C, 98–253C, 98–254C, 98–255C, 98–256C, 98–257C, 98–258C, 98–259C, 98–260C, 98–261C, 98–262C, 98–263C, 98–264C, 98–265C, 98–266C, 98–267C, 98–268C, 98–269C, 98–270C, 98–271C, 98–272C, 98–273C, 98–274C, 98–275C, 98–276C, 98–277C, 98–278C, 98–279C, 98–280C, 98–281C, 98–282C, 98–283C, 98–284C, 98–285C, 98–286C, 98–287C, 98–288C, 98–289C, 98–290C, 98–291C, 98–292C, 98–293C, 98–294C, 98–295C, 98–296C, 98–297C, 98–298C, 98–299C, 98–300C, 98–301C, 98–302C, and 98–303C); Order of April 13, 2001

(dismissing Count II in Case Nos. 98–508C, 98–514C, and 98–600C).

8. The plaintiffs also filed a Verified Motion to Conduct Discovery ("Plaintiffs' Discovery Motion") on August 10, 2000. In the Plaintiffs' Discovery Motion, the plaintiffs moved for leave to conduct discovery regarding the allegation, found in part IIB of the Defendant's Partial Motion to Dismiss, that the FDA never enforced the tobacco vending machine regulations. The plaintiffs asserted that such factual assertions converted the Defendant's Partial Motion to Dismiss, or at least that portion of the motion, into a motion for summary judgment and claimed that the "information needed to respond [to such allegations] is largely in the hands of the Government." Plaintiffs' Discovery Motion at 2–3. The defendant opposed the Plaintiffs' Discovery Motion, arguing that the plaintiffs failed to demonstrate any basis for such discovery under RCFC 56(g). The plaintiffs did not file a reply to the defendant's opposition. Both parties appeared before this Court on October 17, 2000, and on October 31, 2000, for oral arguments on the Plaintiffs' Discovery Motion. The Plaintiffs' Discovery Motion was denied by the Court's Order on November 15, 2000.

## Discussion

### I. The FDA Did Not Possess the Authority to Regulate Tobacco Under the FDCA.

The defendant argues that Count I of the plaintiffs' Amended Complaint must be dismissed because the FDA did not have the authority under the FDCA to issue the tobacco vending machine regulations. *See* Def.'s Partial Mot. to Dismiss at 19–37. In summary, the defendant asserts that the Supreme Court's holding in *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000), establishes that Congress never gave the agency the authority to regulate cigarettes and smokeless tobacco. Accordingly, because the FDA never possessed the authority to regulate such products, no compensable taking could arise. This Court agrees that the Supreme Court's holding in *Brown & Williamson* clearly establishes that the agency lacked the authority to issue the tobacco vending machine regulations and therefore holds that Count I of the plaintiffs' Amended Complaint must be dismissed for this reason.

Rule 12(b)(4) of the United States Court of Federal Claims (RCFC) permits a defendant to file a motion to dismiss for failure to state a claim upon which relief may be granted prior to filing its answer.[9] RCFC 12(b)(4). In ruling on a motion to dismiss pursuant to RCFC 12(b)(4), the allegations contained in the complaint will be construed in favor of the plaintiffs. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Perez v. United States*, 156 F.3d 1366, 1370 (Fed.Cir.1998); *Davies Precision Mach., Inc. v. United States*, 35 Fed.Cl. 651, 662 (1996). The motion will not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). *See also Trauma Serv. Group v. United States*, 104 F.3d 1321, 1325 (Fed.Cir.1997). However, mere conclusory allegations of law and unsupported inferences of fact will not withstand a motion to

9. RCFC 12(b)(4) is this Court's equivalent to Federal Rule of Civil Procedure 12(b)(6). *See Som-*

dismiss. *Bradley v. Chiron Corp.*, 136 F.3d 1317, 1321 (Fed.Cir.1998).

The Fifth Amendment to the United States Constitution provides that the Government must pay just compensation if it takes private property for public use. U.S. Const. amend. V. This Court generally has jurisdiction over claims for compensation arising from an alleged taking pursuant to the Tucker Act. 28 U.S.C. § 1491 (1994) ("The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded * * * upon the Constitution * * *.").

It is well settled that a compensable taking may be effectuated by governmental regulation. *See Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978); *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922). "[W]hile property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Pennsylvania Coal Co.*, 260 U.S. at 415, 43 S.Ct. 158. *See also M & J Coal Co. v. United States*, 47 F.3d 1148, 1153–54 (Fed. Cir.), *cert. denied*, 516 U.S. 808, 116 S.Ct. 53, 133 L.Ed.2d 18 (1995).

■ Even if a regulation only denies an owner the use of his property for a finite period of time, the Fifth Amendment requires the payment of just compensation. *See First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304, 318, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987); *Marks v. United States*, 34 Fed.Cl. 387, 406–07 (1995), *aff'd*, 116 F.3d 1496 (Fed.Cir.1997), *cert. denied*, 522 U.S. 1075, 118 S.Ct. 852, 139 L.Ed.2d 753 (1998). Such "temporary reversible takings should be analyzed in the same constitutional framework applied to permanent irreversible takings * * *." *Yuba Natural Res., Inc. v. United States*, 821 F.2d 638, 641 (Fed.Cir. 1987). *See also First English*, 482 U.S. at 318, 107 S.Ct. 2378, 96 L.Ed.2d 250; *Bass Enters. Prod. Co. v. United States*, 133 F.3d 893, 896 (Fed.Cir.1998).

*mers Oil Co. v. United States,* 241 F.3d 1375, 1378 (Fed.Cir.2001).

It is also well settled, however, that a compensable taking arises only if the Government's conduct in question was authorized. *See United States v. North Am. Transp. & Trading Co.,* 253 U.S. 330, 333, 40 S.Ct. 518, 64 L.Ed. 935 (1920); *Del–Rio Drilling Programs, Inc. v. United States,* 146 F.3d 1358, 1362 (Fed.Cir.1998); *Coast Indian Cmty. v. United States,* 213 Ct.Cl. 129, 147, 550 F.2d 639, 649 (1977). *See also Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 585, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) ("[p]rior cases in this Court have cast doubt on the right to recover in the Court of Claims on account of properties unlawfully taken by government officials for public use * * *."). In order for the United States to be liable for an alleged taking, the officials responsible for causing the taking must have been "duly authorized" to effectuate the taking, "either directly by Congress or by the official upon whom Congress conferred the power." *North Am. Transp. & Trading Co.,* 253 U.S. at 333, 40 S.Ct. 518. *See also Regional Rail Reorganization Cases,* 419 U.S. 102, 127 n. 16, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974) (" 'The taking of private property by an officer of the United States for public use, without being authorized, expressly or by necessary implication, to do so by some act of Congress, is not the act of the Government,' and hence recovery is not available in the Court of Claims.") (quoting *Hooe v. United States,* 218 U.S. 322, 336, 46 Ct.Cl. 655, 31 S.Ct. 85, 54 L.Ed. 1055 (1910)); *Southern Calif. Fin. Corp. v. United States,* 225 Ct.Cl. 104, 108, 634 F.2d 521, 523 (1980), *cert. denied,* 451 U.S. 937, 101 S.Ct. 2016, 68 L.Ed.2d 324 ("it is imperative that, before a compensable taking can be found by the court, there must be some congressional authorization, express or implied, for the particular taking claimed"). Congressional authority is an indispensable requirement of any taking claim brought before this Court. The Tucker Act provides this Court with jurisdiction over takings claims because they are founded "upon the Constitution"; claims based on executive actions that were not authorized by Congress, however, are not claims founded "upon the Constitution" but rather are claims based on executive actions taken in violation of the Constitution. *Hooe,*

218 U.S. at 335–36, 31 S.Ct. 85. *See also Florida Rock Indus., Inc. v. United States,* 791 F.2d 893, 898 (Fed.Cir.1986), *cert. denied,* 479 U.S. 1053, 107 S.Ct. 926, 93 L.Ed.2d 978 (1987); *Armijo v. United States,* 229 Ct.Cl. 34, 42–43, 663 F.2d 90, 95 (1981); *NBH Land Co. v. United States,* 217 Ct.Cl. 41, 44, 576 F.2d 317, 319 (1978). Thus, a compensable takings claim cannot arise from executive actions that were wholly unauthorized by Congress.

The Supreme Court's holding in *FDA v. Brown & Williamson,* 529 U.S. 120, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000), foreclosed the possibility of treating the FDA's tobacco regulations as authorized by Congress. In *Brown & Williamson,* the Supreme Court held that the FDA had no authority to regulate cigarettes and smokeless tobacco products as commonly marketed under the FDCA. According to the Supreme Court,

Congress has *clearly precluded* the FDA from asserting jurisdiction to regulate tobacco products. Such authority is inconsistent with the intent that Congress has expressed in the FDCA's overall regulatory scheme and in the tobacco-specific legislation that it has enacted subsequent to the FDCA. In light of this clear intent, the FDA's assertion of jurisdiction is impermissible.

*Id.* at 126, 120 S.Ct. 1291 (emphasis added). The Supreme Court recognized the serious nature of the problem that the FDA sought to address (smoking by adolescents) but observed that "an administrative agency's power to regulate in the public interest must always be grounded in a valid grant of authority from Congress." *Id.* at 161, 120 S.Ct. 1291. Not only was there no valid grant of authority, but further, the Supreme Court held that "Congress has *directly spoken* to the question at issue and *precluded* the FDA from regulating tobacco products." *Id.* at 160–61, 120 S.Ct. 1291 (emphasis added).

Despite the Supreme Court's unambiguous statement that the FDA lacked the authority to regulate cigarettes and smokeless tobacco, the plaintiffs assert that they still may maintain their temporary takings claim because the FDA was acting in "good faith" and

within the scope of its general authority. The plaintiffs rely upon a Federal Circuit decision, *Del–Rio Drilling Programs, Inc. v. United States*, 146 F.3d 1358, 1362 (Fed.Cir. 1998) for the proposition that even unauthorized Government actions that interfere with property rights require the payment of compensation by the Federal Government, so long as such actions are taken in good faith or are within the agency's general area of authority. Pls.' Opp'n Br. at 8. The plaintiffs contend that "[t]he issue is not that the FDA lacked authority, but rather if it exceeded that authority." *Id.* at 9. The plaintiffs, however, misinterpret *Del–Rio.* Even under *Del–Rio*, an agency still must have the general authority, express or implied, to issue a regulation in order for the agency's action to effect a takings. 146 F.3d at 1362. *Del–Rio* did not abolish the authority requirement, so much as it helped define the scope of an agency's implied authority for the purposes of the takings analysis.

In *Del–Rio*, federal gas and oil lessees brought suit against the United States for takings and breach of contract. 146 F.3d at 1360. The United States Department of the Interior (the "Department") had denied to lessees the drilling permits that were necessary to access their previously conveyed mineral leases. *Id.* The Department based this denial upon the lessees' failure to obtain rights-of-way from the Indian tribe on whose reservation lessees sought to drill. *Id.* The Department justified this tribal consent prerequisite in reliance upon the Tribal Consent Act, 25 U.S.C. §§ 323–324 (1994). 146 F.3d at 1361. On motion for summary judgment, the trial court held that the lessees needed to assert that the Department's reliance on the Tribal Consent Act was legally erroneous, or else the consent requirement would have been an encumbrance upon the mineral leases from the outset. *Del–Rio Drilling Programs, Inc. v. United States*, 37 Fed.Cl. 157, 162 (1997). However, the trial court also observed that if reliance upon the Tribal Consent Act was legally erroneous, the les-

sees takings claim would disappear, because the Department would have no authority to require consent. *Id.* Thus, the lower court dismissed the lessees takings claim.[10]

On appeal, the Federal Circuit reversed and remanded the trial court's decision. The Federal Circuit stressed that a compensable taking will not arise unless the Government's action in question is authorized, but observed that:

> In a case such as this one, in which the alleged taking consists of regulatory action that deprives a property-holder of the enjoyment of property, government agents have the requisite authorization if they act within the general scope of their duties, *i.e.*, if their actions are a "natural consequence of Congressionally approved measures," *NBH Land Co. v. United States*, 217 Ct.Cl. 41, 576 F.2d 317, 319 (1978), or are pursuant to "the good faith implementation of a Congressional Act," *Southern Cal. Fin. Corp. v. United States*, 225 Ct.Cl. 104, 634 F.2d 521, 525 (1980). The principle underlying this rule is that when a government official engages in *ultra vires* conduct, the official "will not, in any legal or constitutional sense, represent the United States, and what he does or omits to do, without the authority of Congress, cannot create a claim against the Government 'founded upon the Constitution.' " *Hooe v. United States*, 218 U.S. 322, 335, 46 Ct.Cl. 655, 31 S.Ct. 85, 54 L.Ed. 1055 (1910).

*Del–Rio*, 146 F.3d at 1362. The Federal Circuit was careful to note that "the Interior Department officials who denied drilling permits to Del–Rio and advised Del–Rio that it had to obtain rights-of-way from the Ute tribe were acting within the scope of their statutorily authorized duties." *Id.* at 1363. Because the Interior Department had the general authority to regulate mining permits, the takings claim could not be dismissed for a lack of authority.[11]

---

10. The trial court further dismissed the lessees' contract claim. *Id.* at 162–63.

11. In *Rith Energy, Inc. v. United States*, the Federal Circuit recently reaffirmed that *Del–Rio* requires that agency actions be authorized in order

to effectuate a valid takings claim. 2001 WL 456511, *8 (Fed.Cir.2001) ("a takings claim lies, *as long as* the government's action was authorized * * *.") (emphasis added).

In the case at bar, however, the Supreme Court already has held that the FDA had no authority to regulate cigarettes or smokeless tobacco as commonly marketed. While the plaintiffs correctly observe that the FDA has the authority to regulate food and drugs under the FDCA, this is ultimately irrelevant to the question of whether or not the agency has the authority to regulate tobacco products. The Supreme Court has held that "there is no room" for the regulation of cigarettes or smokeless tobacco within the structure of the FDCA and that tobacco products "simply do not fit" under the agency's regulatory umbrella. *Brown & Williamson,* 529 U.S. at 143, 120 S.Ct. 1291. The FDA's actions were *ultra vires,* and such conduct will not lead to a compensable taking claim. *See Del–Rio,* 146 F.3d at 1362–63. Finally, while the Department of Interior made a legal error in determining whether or not it should take the Tribal Consent Act into consideration during the permitting process in *Del–Rio,* the FDA made a far more serious mistake in construing its own jurisdiction in the present case. When a legal error is committed by an agency regarding the question of the agency's own jurisdiction to regulate, such error will be more likely to implicate the question of whether or not an agency had the proper authority to regulate. In this case, the FDA clearly did not have the proper general authority to regulate.

In the alternative, the plaintiffs claim that because Congress specifically appropriated money for the enforcement of the FDA regulations, such appropriation served as congressional authorization of the FDA's tobacco regulations. Pls.' Opp'n Br. at 10–11. The plaintiffs cite to *Hooe v. United States,* 218 U.S. 322, 46 Ct.Cl. 655, 31 S.Ct. 85, 54 L.Ed. 1055 (1910), in support of this proposition. The plaintiffs, however, both misread *Hooe* and mischaracterize the nature of the congressional appropriation to the FDA. Indeed, while *Hooe* provides further clear support for the proposition that an action by an agency must be congressionally authorized in order for it to constitute a taking, it does not support the blanket proposition that an appropriation serves as authorization.

In *Hooe,* Congress had specifically appropriated a certain sum of money to be used as full rent for the office space used by the Civil Service Commission (the "Commission"). 218 U.S. 322, 327–30, 46 Ct.Cl. 655, 31 S.Ct. 85, 54 L.Ed. 1055. Congress further provided that no Government agency could contract for the rental of property without such an appropriation and forbade agencies to contract to spend in excess of such appropriations. *Id.* at 331, 31 S.Ct. 85. The owner of the building leased by the Commission, however, brought a takings claim against the United States to recover the difference between the appropriated rent and the fair rental value of the building (including the basement), asserting that the Commission had occupied the basement of his building without his consent. *Id.* at 326–27, 335, 31 S.Ct. 85. The Supreme Court held that the occupancy of the basement by the Commission was not authorized by Congress, and therefore the Court disallowed a recovery by the building owner. The Supreme Court stated, in pertinent part,

> It cannot be said that any claim for a specific amount of money against the United States is founded on the Constitution, *unless such claim be either expressly or by necessary implication authorized by some valid enactment of Congress.* * * * If an officer of the United States assumes, by virtue alone of his office, and *without the authority of Congress,* to take such matters under his control, he will not, in any legal or constitutional sense, represent the United States, and what he does or omits to do, without the authority of the Congress, cannot create a claim against the government, "founded upon the Constitution." It would be a claim having its origin in a violation of the Constitution. The constitutional prohibition against taking private property for public use without just compensation is directed against the government, and not against individual or public officers proceeding without the authority of legislative enactment. *The taking of private property by an officer of the United States for public use, without being authorized, expressly or by necessary implication, to do so by some act of Congress, is not the act of the government.*

*Id.* at 335–36, 31 S.Ct. 85 (emphasis added) (footnote omitted).

*Hooe* provides clear support for the proposition that a takings claim cannot arise when an agency acts without congressional authority. It does not, however, hold that an appropriation alone is enough to create authority within an agency. While the failure to appropriate money was an important factor in *Hooe* in determining that the Commission had no authority to occupy the basement of the building, this failure to appropriate was significant primarily in the context of the legislation forbidding an agency to rent without a specific appropriation. Congress effectively denied the Commission the authority to occupy office space without a specific appropriation for that purpose and only permitted the Commission to obligate the United States for rent up to the amount allocated. In the context of such legislation, the Commission's occupation of the basement was an *ultra vires* act.

Moreover, simply because the lack of an appropriation demonstrates a lack of authority does not mean that an appropriation by itself will create such authority. The Supreme Court has held that a general appropriation of funds for an overall program is not sufficient to bestow authority upon a particular aspect of an agency's program. *Ex Parte Endo*, 323 U.S. 283, 303 n. 24, 65 S.Ct. 208, 89 L.Ed. 243 (1944). *See also D.C. Fed'n of Civic Ass'ns, Inc. v. Airis*, 391 F.2d 478, 481–82 (D.C.Cir.1968) (Congress' general knowledge that a particular freeway project was being planned or a general intention to advance the freeway system as a whole was insufficient to support ratification by appropriation). This is especially true where there is a pre-existing law that determines the scope of an agency's authority, such as the FDCA. While appropriations are "Acts of Congress" that may change the existing law, there is a strong presumption that they do not. *See TVA v. Hill*, 437 U.S. 153, 190, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). This is not to say that an appropriation may not constitute a ratification or change in an agency's authority, only that an appropriation does not automatically translate to authoriza-

tion. *See, e.g., Brooks v. Dewar*, 313 U.S. 354, 361, 61 S.Ct. 979, 85 L.Ed. 1399 (1941) (holding that repeated appropriations of the proceeds of certain fees constituted a ratification of agency policy). An appropriation, however, must "plainly show a purpose to bestow the precise authority which is claimed." *Ex Parte Endo*, 323 U.S. at 303 n. 24, 65 S.Ct. 208.

Congress, however, explicitly specified that its appropriation to fund the FDA's implementation of the tobacco regulations did not authorize the agency's tobacco regulations. The 1997 Senate Report regarding the FDA's appropriations specifically stated:

> Given that FDA's assertion of jurisdiction over tobacco products is pending before the Federal courts, and a settlement proposal is pending before the Congress, the Committee does not provide the $29,086,000 increase requested for additional outreach activities and for enforcement grants to States.
>
> The Committee emphasizes that *its action is in no way to be construed as concurring or disagreeing with any court ruling regarding FDA's authority to implement its tobacco rule* or the proposed tobacco settlement.

S. REP. No. 105–51 at 117 (1997) (emphasis added). Both the 1998 and 1999 Senate Reports regarding the FDA's appropriations also stated that any appropriation for the FDA's tobacco programs was "in no way to be construed as concurring or disagreeing with any court ruling regarding FDA's authority to implement its tobacco rule * * *." S. REP. No. 105–212 (1998); S. REP. No. 106–80 (1999). Thus, even in appropriating money for the FDA's tobacco program, Congress explicitly disclaimed that such appropriation should be read as authorizing the tobacco regulations.

Our conclusion in this matter regarding the defendant's authority argument is consistent with the prior opinions of this Court in two closely-related cases: *A–1 Amusement Co., et al. v. United States*, 48 Fed.Cl. 63 (2000) (J. Hewitt), *appeal docketed*, No. 01–5085 (Fed.Cir. Apr. 16, 2001),[12] and *Brubaker Amusement Co., Inc. v. United States*, No.

---

12. The plaintiffs in *A–1 Amusement* failed to file a timely appeal of the final judgment as to Count I.

98–511C (January 12, 2001) (J. Weinstein), *appeal docketed,* No. 01–5070 (Fed.Cir. Mar. 19, 2001). In both *A–1 Amusement* and *Brubaker Amusement,* this Court dismissed tobacco vending machine owner/operators' takings claims against the United States for failure to state a claim upon which relief may be granted to the extent that such claims were based on the FDA's tobacco regulations.[13] This Court reasoned that the Supreme Court clearly held in *Brown & Williamson* that the FDA lacked the authority to promulgate the tobacco regulations and that, without such authority, there could be no takings claims. In *A–1 Amusement,* for example, this Court held that the plaintiffs' position that the FDA's conduct was unauthorized, but lawful, was "untenable." 48 Fed.Cl. at 68. Similarly, the ·Court held in *Brubaker Amusement* that the "FDA's actions [in promulgating the tobacco regulations] were clearly outside the scope of their duties and therefore ultra vires." *Brubaker Amusement,* No. 98–511C at 7. In neither case did this Court hold that the FDA had any statutory authority to issue the tobacco regulations.

For the above-stated reasons, Count I of the plaintiffs' Amended Complaint must be dismissed. The Supreme Court determined in *Brown & Williamson* that the FDA had no authority to regulate cigarettes and smokeless tobacco as commonly marketed, and, therefore, no compensable taking may arise.

**II. Mere Consideration of a Regulation, Short of Implementation, Cannot Effectuate a Taking, and the Vending Machine Regulations Were Never Implemented.**

 The FDA's lack of authority to regulate cigarettes and smokeless tobacco, as cus-

tomarily marketed, provides an adequate and independent ground for dismissing Count I of the Amended Complaint. However, the defendant also argues that the plaintiffs would be precluded from making their takings claims because the mere consideration, short of implementation, of a regulation does not give rise to a valid takings claim, and the FDA never implemented the vending machine regulations. Def.'s Partial Mot. to Dismiss at 37–42. As a matter of law, this Court agrees that the mere consideration of a regulation cannot give rise to a takings claim and that the plaintiffs cannot assert a takings claim prior to the effective date of the tobacco regulations. In light of the stay on enforcement of the access restrictions issued by the United States District Court for the Middle District of North Carolina in *Coyne Beahm, Inc. v. FDA,* 966 F.Supp. 1374, 1400–01 (M.D.N.C.1997), the clear evidence of nonenforcement, and the plaintiffs' failure to produce any evidence tending to indicate any enforcement of the vending machine regulations by the FDA, this Court further finds that even after the effective date of implementation there was no enforcement of the tobacco vending machine regulations. Therefore, Count I of the Amended Complaint should be dismissed on this ground, even if the authority argument were to fail.

In their Amended Complaint, the plaintiffs assert that the defendant effected a temporary taking of their property for a period commencing in 1994 and ending with the March 21, 2000 decision of the Supreme Court in *FDA v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 120 S.Ct. 1291, 146

---

Accordingly, an Order to Show Cause was issued in two other tobacco vendor cases before the same judge, and these two cases were subsequently dismissed. *Automated Servs. v. United States, Inc.,* 48 Fed.Cl. 850 (2001), *appeal docketed,* No. 01–5084 (Fed.Cir. Apr. 16, 2001); *Pavlic Vending Serv., Inc. v. United States,* 48 Fed.Cl. 842 (2001), *appeal docketed.,* No. 01–5083 (Fed. Cir. Apr. 16, 2001). Despite the apparent failure to file a timely appeal as to Count I, an appeal has since been docketed in *A–1 Amusement,* No. 01–5085 (Fed.Cir. Apr. 16, 2001).

**13.** On March 22, 2001, this Court also dismissed another tobacco vending machine owner/operator's takings claim that had been premised on the FDA's regulations for a different reason. *See B & G Enters. v. United States,* 48 Fed.Cl. 866 (2001) (J. Hodges), *appeal docketed,* No. 01–5080 (Fed.Cir. Apr. 9, 2001). The *B & G Enterprises* March 22, 2001 decision is discussed further in Part II of this Opinion. *See infra* p. 360.

L.Ed.2d 121 (2000).[14] Am. Compl. ¶ 21. The FDA, however, did not even issue its proposed regulations regarding cigarettes and smokeless tobacco until August 11, 1995. 60 Fed.Reg. 41,314 (1995). *See also* Am. Compl. ¶ 7. The FDA's final tobacco regulations were published approximately one year later, on August 28, 1996. 61 Fed.Reg. 44,396 (1996). *See also* Am. Compl. ¶ 8. Further, the tobacco vending machine regulations at issue were not scheduled to go into effect until August 28, 1997. 21 C.F.R. pt. 897 note. The plaintiffs attempt to expand the period that the FDA allegedly effected a temporary taking by beginning their countdown with the date that the FDA purportedly started its "public campaign against the Plaintiffs." Am. Compl. ¶ 21. As a matter of law, however, the earliest date that a takings could have commenced in this situation was on August 28, 1997, the date the regulations were scheduled to go into effect.

The Supreme Court has held that the "mere enactment of legislation which authorizes the condemnation of property cannot be a taking. Such legislation may be repealed or modified, or appropriations may fail." *Danforth v. United States*, 308 U.S. 271, 286, 60 S.Ct. 231, 84 L.Ed. 240 (1939). *See also Willink v. United States*, 240 U.S. 572, 579–80, 36 S.Ct. 422, 60 L.Ed. 808 (1916). While the Supreme Court in *Danforth* was addressing the enactment of congressional legislation, the same logic may be applied to the promulgation of a regulation by an administrative agency. A regulation may be repealed or modified, stayed or invalidated, or superceded by congressional act prior to implementation. A takings claim only lies to the extent that a regulation results in an actual Government restriction on or interference with property.

■■■ The mere assertion of jurisdiction by an agency and the issuing of proposed regulations cannot effect a taking. *See United States v. Riverside Bayview Homes, Inc.*,

474 U.S. 121, 126–27, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985) (citing *Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 293–97, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981)) (the mere assertion of regulatory jurisdiction does not constitute a regulatory taking). Such proposed regulations merely provide notice of an agency's intended plans and "[m]ere candor by public officials about their plans has never been held to constitute a taking. Even 'a threat of condemnation is not a taking * * *.'" *NBH Land*, 217 Ct.Cl. at 44, 576 F.2d at 319 (quoting *Hempstead Warehouse Corp. v. United States*, 120 Ct.Cl. 291, 306, 98 F.Supp. 572, 573 (1951)).[15] *See also Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 15, 104 S.Ct. 2187, 81 L.Ed.2d 1 (1984). Similarly, the publication of final regulations, which have an effective date subsequent to publication cannot be a taking. The regulations may be repealed or modified, stayed or invalidated, or superceded by congressional act prior to actual implementation. Only a Government regulatory act that actually restricts property may effectuate a taking. *See MacDonald, Sommer & Frates v. Yolo County*, 477 U.S. 340, 348–51, 106 S.Ct. 2561, 91 L.Ed.2d 285, *reh'g denied*, 478 U.S. 1035, 107 S.Ct. 22, 92 L.Ed.2d 773 (1986) (requiring final agency application of regulatory restrictions before a taking will have occurred).

The plaintiffs allege that the pending tobacco regulations caused numerous facility owners to cancel their tobacco vending machine placement contracts with the plaintiffs. The mere fact that the marketplace may have reacted to the impending regulations, however, is irrelevant for the purposes of the takings analysis. In *NBH Land*, for example, military officers had divulged to local officials that the Army planned to expand a military facility in Colorado. This allegedly caused a decrease in the value of certain lots that were to be subject to condemnation. Nevertheless, the United States Court of Claims held that the real estate market's

---

14. *See supra* note 6.

15. In January 1997, a letter signed by Dr. David Kessler, Commissioner of the FDA, was sent by the FDA to various businesses with placement contracts with the plaintiffs. The letter advised the businesses of the new regulations. The FDA also distributed a booklet prepared on February 20, 1997, describing the enforcement of the tobacco regulation. However, under the logic employed above, neither the letter nor the booklet can be held to effectuate a taking.

reaction to the planned condemnation did not give rise to a takings claim. The risks of the market prior to an actual taking are traditionally borne by the owner of the property, as "incidents of ownership" and accordingly the reactions of third parties cannot be considered as effecting a taking. *Danforth*, 308 U.S. at 285, 60 S.Ct. 231.

Thus, this Court holds that the earliest date that a takings may have commenced in this situation was August 28, 1997, the date the regulations were scheduled to go into effect.

The defendant, however, asserts in Part IIB of the Partial Motion to Dismiss that the FDA never actually enforced the tobacco vending machine regulations, because of a stay order issued by the United States District Court for the Middle District of North Carolina on April 25, 1997. Def.'s Partial Mot. to Dismiss at 41–42. *See Coyne Beahm, Inc. v. FDA*, 966 F.Supp. 1374, 1397–1401 (M.D.N.C.1997). In addition to highlighting the *Coyne Beahm* order, the defendant has supplied this Court with additional documents confirming that the FDA abided by the stay on a national basis. To the extent that Part IIB relies upon evidence beyond the allegations of the Complaint, the Court finds that this portion of the Partial Motion to Dismiss, and this portion alone, is more properly characterized as a motion for summary judgment under RCFC 56.

Pursuant to RCFC 56, summary judgment will be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c). *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed.Cir.1987). A dispute over a material fact is one that might affect the outcome of the suit under governing law. *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. This Court will not grant summary judgment if the dispute about a material fact is one in which a reasonable factfinder could return a verdict for a nonmoving party. *See id.* At the same time, summary judgment will not be treated as "a disfavored procedural shortcut," for it serves an important role in dismissing "factu-

ally insufficient claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The party that brings the motion for summary judgment (here the defendant) bears the initial burden of demonstrating the lack of an issue of material fact. *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548. After the moving party has demonstrated the absence of a material fact, the burden shifts to the party opposing the motion (here the plaintiffs) to demonstrate that an issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 153, 159–61, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569, *reh'g denied*, 393 U.S. 901, 89 S.Ct. 63, 21 L.Ed.2d 188 (1968). The Court must resolve any doubts about factual issues in favor of the nonmoving party, *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed.Cir. 1985), to whom the benefits of all favorable inferences and presumptions run. *See H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

Nevertheless, "[a] party opposing summary judgment 'must do more than whet the curiosity of the court; he must support vague accusations and surmise with concrete particulars.'" *Crawford v. United States*, 3 Cl.Ct. 323, 328 (1983) (quoting *Applegate v. Top Assocs., Inc.*, 425 F.2d 92, 96 (2d Cir.1970)), *aff'd*, 732 F.2d 168 (Fed.Cir.) (table), *cert. denied*, 469 U.S. 861, 105 S.Ct. 194 (1984). Indeed, by signing a complaint, motion, or other paper filed by a party, an attorney certifies that the allegations contained therein were formed after a reasonable inquiry and are well grounded in fact. RCFC 11. In the present case, this Court finds that the defendant has met its initial burden of demonstrating the lack of a dispute of material facts with regard to the FDA's nonenforcement of the tobacco vending machine regulations. Thus, the burden has shifted to the plaintiffs, who must demonstrate some plausible basis for their belief that the FDA enforced the regulations. Even given the benefit of all favorable inferences and pre-

sumptions, the plaintiffs have not shown that they have any basis for this allegation.

Prior to the effective date of the tobacco vending machine regulations, various tobacco companies, advertisers, and retailers brought suit against the FDA in the United States District Court for the Middle District of North Carolina, challenging the agency's authority to regulate tobacco under the FDCA. On April 25, 1997, the district court held that the FDA had the authority to issue some of the tobacco regulations but nevertheless ordered that the agency "shall not implement any of the additional Regulations set for implementation on August 28, 1997, pending further orders by the court." *Coyne Beahm,* 966 F.Supp. at 1400–01. The tobacco vending machine regulations at issue in this case were among the regulations which implementation was stayed by this order.

■ Nothing in the language of the district court's order suggests that the scope of the order was geographically limited to the Middle District of North Carolina. This Court believes that the district court's order was binding on the FDA on a nationwide basis as a matter of law. When a challenge is brought to the validity of a regulation, as opposed to a challenge to the application of an otherwise valid regulation, the district court's determination will be binding upon the entire agency across the nation. *See generally Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 890 n. 2, 913, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) (noting how a successful challenge to an agency regulation by an individual can affect the entire agency program); *Harmon v. Thornburgh,* 878 F.2d 484, 495 n. 21 (D.C.Cir.1989), *cert. denied sub nom., Bell v. Thornburgh,* 493 U.S. 1056, 110 S.Ct. 865, 107 L.Ed.2d 949 (1990), (stating that "[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated * * *."). It would be senseless to require the relitigation of the validity of a regulation in all federal district courts in order to effectively stay the implementation of a regulation when the challenge brought is programmatic, and not one of individual application. Even without considering the additional material submitted by the defendant, as a matter of law, the vending machine regulations never took effect, and, therefore, Count I must be dismissed.

■ Nevertheless, presuming that the FDA was not legally bound by the order of the United States District Court for the Middle District of North Carolina on a nationwide basis, the defendant has produced ample evidence that the FDA abided by the order on a nationwide basis and that the tobacco vending machine regulations were never enforced. The defendant has supplied this Court with a copy of a June 6, 1997 letter from William B. Shultz, FDA's Deputy Commissioner for Policy, to the plaintiffs in *Coyne Beahm,* which states in pertinent part that the district court's order

> requires the Agency not to implement any of its access provisions intended to go into effect on August 28, 1997, pending further order of the court. It is our expectation, therefore, that retail establishments are beginning to make preparations to comply with these provisions, but that final action by them will await the Fourth Circuit's ruling. Consequently, it would be appropriate to grant an additional 90 days after the Fourth Circuit lifts the order of injunction.

Def.'s Partial Mot. to Dismiss App. at 7.

In addition, the defendant provided this Court with a copy of Deputy Commissioner Shultz's June 9, 1997 letter to counsel for the plaintiffs in *Cigarette Ventures, Inc. v. FDA,* No. 97–CV–1352FMH (N.D.Ga.), in which the commissioner reiterates that the FDA would not enforce the vending machine regulations until 90 days after the stay in *Coyne Beahm* was lifted. Def.'s Partial Mot. to Dismiss App. at 9–10. Based on this letter, the plaintiffs in the *Cigarette Ventures* case withdrew their motion for a temporary or preliminary injunction of the FDA's vending machine regulations. *Id.* at 11–13.

The defendant also produced a copy of a Talk Paper issued on August 27, 1997, an FDA Backgrounder dated May 1997, and a copy of an FDA draft guidance publication from July 1997 entitled "Children & Tobacco, Frequently Asked Questions." *See Tobacco Regulation Update,* FDA TALK PAPER (Aug.

27, 1997) (T97–40) (Def.'s Partial Mot. to Dismiss App. at 15, Kirchner Decl. Ex. 2); *Summary of District Court's Ruling on FDA's Jurisdiction Over, and Regulation of, Cigarettes and Smokeless Tobacco,* FDA BACKGROUNDER (May 2, 1997) (BG 97–9) (Kirchner Decl. Ex 3); CHILDREN & TOBACCO, FREQUENTLY ASKED QUESTIONS (Draft Guidance) (July 1997) (DHHS Pub. No. (FDA) 97–1285) (Kirchner Decl. Ex. 4). These documents were used by the FDA's Press Office and Public Affairs Specialists to respond consistently and accurately to public questions on the agency's tobacco regulations. Kirchner Decl. ¶ 6. All three of these documents clearly acknowledge that the regulations scheduled to go into effect on August 28, 1997, including the tobacco vending machine regulations, were delayed pending court action. For example, the Talk Paper explicitly sets forth that "retailers are not required to remove vending machines or self-service displays at this time." FDA TALK PAPER, *supra.*

Finally, the FDA presented a declaration from the last Acting Director of the Office of Tobacco Programs, Anne Kirchner,[16] which clearly states that the "FDA's Office of Tobacco Programs never developed a program to implement or enforce the Vending Machine regulation, and never brought any enforcement action for a violation of the Vending Machine regulation." Kirchner Decl. ¶ 8. With regards to the *Coyne Beahm* order, Ms. Kirchner explicitly acknowledges that the "FDA respected the district court's order nationwide." *Id.* at ¶ 6.

In contrast, the plaintiffs can point to nary a shred of evidence suggesting that the FDA enforced the tobacco vending machine regulations. Counsel for the plaintiffs represents well over 500 vending machine plaintiffs in related suits before this Court. It is beyond belief that counsel cannot produce a single piece of evidence supporting the plaintiffs' allegations.[17] While the plaintiffs have supplied this Court with several declarations, none of these declarations provide any evidence of FDA enforcement of the tobacco vending machine regulations. These declarations show state and local enforcement of state and local tobacco vending machine regulations. *See, e.g.,* Pls.' Opp'n Br.App. at A–59–60 (Savar Decl.), A90–98 (Marchetti Decl.), A99–102 (Notini Decl.). The declarations evidence that the FDA notified public facility owners of the pending regulations. *See, e.g., id.* at A–56 (Frankhauser Decl.). But the plaintiffs' declarations do not provide any evidence of FDA enforcement of the vending machine regulations. Indeed, one of the declarations even candidly admits that the "new rules did not go into effect on the intended date * * *." *Id.* at A–54 (Valentine Decl.).

The Court acknowledges that the plaintiffs have shown evidence that tends to support the proposition that the FDA enforced the age and identification tobacco regulations. The defendant does not deny that the FDA enforced the age and identification tobacco regulations. *See* Kirchner Decl. ¶ 7. The age and identification tobacco regulations, howev-

---

**16.** Ms. Kirchner was a policy analyst in the Office of Policy at the FDA from January 1996 through 1997. As a policy analyst, she was assigned to work on the issuance and implementation of the FDA's tobacco regulations. In 1998, she joined the FDA's newly formed Office of Tobacco Programs as Regulatory Counsel. In 1999, she became Director of Tobacco Policy Coordination, and in June 2000, she was made Acting Director of the Office of Tobacco Programs. The Office of Tobacco Programs closed on September 29, 2000. *See* Kirchner Decl. ¶ 1.

**17.** Indeed, this Court has given the plaintiffs multiple opportunities to produce any evidence that supports the plaintiffs' allegation that the FDA enforced the tobacco vending machine regulations. At hearings on Plaintiffs' Discovery Motion held on October 17, 2000, and October 31, 2000, this Court directly questioned the

plaintiffs whether they had any evidence supporting their theory that FDA enforced the regulations. In response to the Court's inquiry, the plaintiffs pointed to alleged evidence that had no connection with enforcement of the vending machine regulations by the FDA and asserted that they had "anecdotal" evidence of enforcement through "subterfuge." The ethereal and speculative nature of the plaintiffs' assertions compelled this Court to deny Plaintiffs' Motion to Compel Discovery on November 15, 2000. However, in this Order, the Court once again allowed the plaintiffs "the opportunity to attach any and all evidence in its possession of FDA enforcement of the tobacco vending machine regulations" to its Brief in Opposition to the Defendant's Partial Motion to Dismiss. *See* Order of November 15, 2000.

er, are not at issue in this suit. The age and identification requirements did not require the removal of plaintiffs' vending machines; they merely barred the sale of cigarettes or smokeless tobacco to anyone younger than 18 years of age and required retailers to verify a prospective purchaser's age by means of photographic identification. While the vending machine regulations would have had an impact upon the plaintiffs' abilities to enter into vending machine contracts with various facilities, the ability to contract was unimpaired by the age and identification regulations.

Several other courts have previously determined that the FDA abided by the *Coyne Beahm* stay. In *Vermont Vending, Amusement & Music Operators Associates, Inc. v. Hoyt*, Civil No. 1:97–CV–342 (D.Vt. Oct. 29, 1997), a trade association for cigarette vendors sought a temporary restraining order and preliminary injunction against a Vermont law that prohibited the sale of tobacco from vending machines except in those commercial establishments where no one under the age of 18 could legally enter. The vendors argued that the Vermont law was preempted by the FDA's tobacco vending machine regulations. The FDA submitted to the Vermont district court Deputy Commissioner Shultz's letter to counsel in *Coyne Beahm* and the Talk Paper dated August 27, 1997. Based on these submissions, the court held that "[t]he FDA is not currently enforcing its vending machine regulation." *Id.* at 4. Accordingly, the court denied the vendors' requested relief "because no federal requirements are currently in force with respect to cigarette vending machines." *Id.* at 6. The court further rejected suggestions that the North Carolina district court's order had no effect in Vermont, stating that "[n]either the language of the court order nor the FDA's interpretation of the order suggest that the stay is geographically limited." *Id.* at 7.

Similarly, in *T.D. Rowe Corp. v. City & County of San Francisco*, No. 992–022 (Sup.Ct.Calif., Jan. 16, 1998), a federal preemption challenge was asserted against a San Francisco ordinance banning tobacco vending machines. The plaintiff in that case also sought a temporary restraining order or preliminary injunction against the enforcement of the local ordinance because of federal preemption. The Superior Court of the State of California denied the requested relief on the ground that "the FDA regulations * * * have been stayed by federal court order * * *." *Id.* at 1–2.

In addition, in a similar tobacco vending machine taking case before this Court, the Court has dismissed a tobacco vending machine owner/operator's takings claim against the United States because "[t]he vending machine regulations that would have restricted retailers in the placement of the machines never took effect." *B & G Enters., Ltd. v. United States*, 48 Fed.Cl. 866, 869 (2001) (J. Hodges), *appeal docketed*, No. 01–5080 (Fed. Cir. Apr. 9, 2001) ("*B & G II*"). In *B & G II*, the Court ordered the plaintiff to provide documentation supporting its claim that the FDA "enforced" the vending machine regulations. *Id.* at 868. The Court found that the plaintiff was wholly unable to substantiate its claims of enforcement. In addition, the Court observed that several FDA publications and documents, as well as the *Coyne Beahm* order, supported the defendant's claim that the FDA never enforced the tobacco vending machine regulations. *Id.* at 868–69. Thus, the Court dismissed the plaintiff's complaint. *Id.* at 869.

In conclusion, there is not a scintilla of evidence that the FDA ever enforced the tobacco vending machine regulations. Implementation of these regulations was stayed by the United States District Court for the Middle District of North Carolina, and the FDA abided by this stay on a nationwide basis. Whether this Court treats the defendant's motion as either a motion to dismiss or a motion for summary judgment, Count I of the plaintiffs' Amended Complaint must be dismissed because the relevant FDA regulations never went into effect, as a matter of law and fact.

### III. Taking as a Matter of Law.

Finally, the defendant asserts that, as a matter of law, the vending machine regulation did not effect a taking of the plaintiffs' property. Def.'s Partial Mot. to Dismiss at 42–61. The defendant claims that the plain-

tiffs neither lost a compensable property interest that would have been taken by the regulations, nor would the plaintiffs be able to show that the FDA's regulations constituted a Fifth Amendment taking of any such property interest. While this Court believes that the plaintiffs' takings claim could well be defective as a matter of law, the Court declines to rule on this issue at this time, finding that the FDA's lack of authority and the agency's failure to implement the vending machine regulations provide two separate and adequate independent grounds for dismissing Court I of the plaintiffs' Amended Complaint in any event. Nevertheless, for the sake of completeness, the Court will briefly discuss the defendant's arguments regarding the plaintiffs' claim being defective as a matter of law.

The Supreme Court has "eschewed the development of any set formula for identifying a 'taking' forbidden by the Fifth Amendment" and instead relies upon "ad hoc factual inquiries into the circumstances of each particular case." *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 224, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986). Nevertheless, this Court traditionally has used a two-tiered approach in evaluating regulatory takings claims. *See M & J Coal Co. v. United States*, 47 F.3d 1148, 1153–54 (Fed.Cir.), *cert. denied*, 516 U.S. 808, 116 S.Ct. 53, 133 L.Ed.2d 18 (1995); *Conti v. United States*, 48 Fed.Cl. 532, 536 (2001). First, this Court assesses whether or not the plaintiffs possess a sufficient ownership or other interest in the property allegedly taken such as to require compensation under the Fifth Amendment. *See Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1027–30, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992); *M & J Coal Co.*, 47 F.3d at 1154. Second, if such a property interest is found, the Court will analyze "[t]he economic impact of the regulation on the claimant * * *, the extent to which the regulation has interfered with distinct investment-backed expectations * * * [, and] the character of the governmental action" to determine if a compensable taking occurred. *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978); *Forest Props., Inc. v. United States*, 39 Fed.Cl. 56, 68 (1997), *aff'd*, 177 F.3d 1360

(Fed.Cir.), *cert. denied sub nom.*, *RCK Props., Inc. v. United States*, 528 U.S. 951, 120 S.Ct. 373, 145 L.Ed.2d 291 (1999).

The defendant contends that the plaintiffs' interests in their vending machines does not include the right to locate them wherever they want and that the FDA regulations do not infringe upon the plaintiffs' actual *ownership* interests in any way. Def.'s Partial Mot. to Dismiss at 45. Thus, the defendant concludes that there are no compensable property interests at stake in this litigation. In response, the plaintiffs assert that:

> The Government's argument that Plaintiff does not have an economic expectancy relating to ownership of the machines misses the point. Plaintiff does not contend that the machines were taken * * *. It is the contracts that were destroyed, not the machines. The FDA regulations did not ban cigarette machines, but restricted their location to such an extent as to require termination of placement contracts. The Government is attempting to obfuscate this issue with a "straw man" argument.

Pls.' Opp'n Br. at 13. *See also id.* at 11 ("The property alleged to have been taken in the Amended Complaint are the Placement Contracts between the cigarette vendors and the establishments where vending machines are located."). *But see* Am. Compl. ¶ 15 (asserting that "[t]he Final Rule's ban on vending machines and the Defendant's related actions have eliminated all economically viable uses of the Plaintiffs' cigarette vending machines and placement contracts.").

It is the plaintiffs, however, who miss the point, not the defendant. Admittedly, the Supreme Court has held that "[c]ontract rights are a form of property and as such may be taken for a public purpose provided that just compensation is paid." *United States Trust Co. of New York v. New Jersey*, 431 U.S. 1, 19 n. 16, 97 S.Ct. 1505, 52 L.Ed.2d 92, *reh'g denied*, 431 U.S. 975, 97 S.Ct. 2942, 53 L.Ed.2d 1073 (1977). *See also Lynch v. United States*, 292 U.S. 571, 579, 54 S.Ct. 840, 78 L.Ed. 1434 (1934). But in such cases, the contract is the property that was actually subject to the taking and the rele-

vant contract that was "taken" was an agreement between the Government and the plaintiffs. For example, in *Lynch*, the Government completely repudiated all war risk insurance agreements that it had provided. The beneficiaries of the agreements brought suit and the Supreme Court held that these agreements were property, subject to compensation for a taking.[18] *See Lynch*, 292 U.S. at 579, 54 S.Ct. 840. Similarly, in *United States Trust Co. of New York v. New Jersey*, the Supreme Court's concern focused on the retroactive impairment of governmental bond obligations.[19] 431 U.S. at 19, 97 S.Ct. 1505.

In contrast, the tobacco vending machines are the property whose value is at stake here, not the placement contracts. The placement contracts are contracts about compensable property, as opposed to being the compensable property themselves. Without the machines, there would be no placement contracts. The right to contract, of course, may be one of the rights associated with the vending machines. Property is, ultimately, "the group of rights which the so-called owner exercises in his dominion of the physical thing," such as "the right to possess, use and dispose of it." *United States v. General Motors Corp.*, 323 U.S. 373, 378, 380, 65 S.Ct. 357, 89 L.Ed. 311 (1945). But the plaintiffs cannot take one stick from the bundle of rights that they possess in their property and treat it as though it were the property alone in and of itself. "Interests that are not sufficiently bound up with the reasonable expectations of the claimant are not 'sticks' in the claimant's 'bundle of rights' and thus do not constitute property for Fifth Amendment purposes." *M & J Coal Co. v. United States*, 30 Fed.Cl. 360, 367 (1994) (citing *Penn Cent. Transp. Co.*, 438 U.S. at 124–25, 98 S.Ct. 2646), *aff'd*, 47 F.3d 1148 (Fed.Cir.), *cert. denied*, 516 U.S. 808, 116 S.Ct. 53, 133 L.Ed.2d 18 (1995).

The FDA's regulations do not infringe on the plaintiffs' actual ownership of their tobacco vending machines in any way. The defendant has not seized the plaintiffs' machines. The regulations do not restrict the plaintiffs' right to transfer the machines, nor do they wholly bar the use of such machines for other vending purposes. Indeed, the regulations do not even bar the use of the machines to sell tobacco products. The plaintiffs may still enter into placement contracts. The regulations, however, if in effect, would have limited the use of tobacco vending machines in certain locations. While this restriction is directed at certain location owners rather than the plaintiffs, in an indirect way, the plaintiffs' abilities to contract with the location owners for the placement of their machines appears to have been impaired by the regulation.

The plaintiffs, however, do not have an unlimited right by contract to place their machines wherever they want. The Supreme Court has stated that "[c]ontracts, however express, cannot fetter the constitutional authority of Congress. Contracts may create rights of property, but when contracts deal with a subject matter which lies within the control of Congress, they have a congenital infirmity. Parties cannot remove their transactions from the reach of dominant constitutional power by making contracts about them." *Connolly*, 475 U.S. at 223–24, 106 S.Ct. 1018 (quoting *Norman v. Baltimore & Ohio R.R. Co.*, 294 U.S. 240, 307–08, 55 S.Ct. 407, 79 L.Ed. 885 (1935)). The limitation on the ability to contract does not necessarily effect a taking of a property interest, especially when the contract itself is not the property interest at stake.

Even if the plaintiffs had a compensable property interest, however, it is doubtful that they could prove a taking. In determining whether a governmental action amounts to a taking or a mere diminution in property val-

---

18. Some modern courts have questioned whether *Lynch* is still good law, to the extent that it stands for the proposition that all contracts generally are property that the Government may not take without just compensation. *See Pro–Eco, Inc. v. Board of Com'rs*, 57 F.3d 505, 510 n. 2 (7th Cir.1995) (holding that *Lynch* has been effectively overruled by subsequent cases).

19. The holding in *United States Trust Co. of New York v. New Jersey* was based on the Contract Clause of the United States Constitution, U.S. Const. art I, § 10, cl. 1, not on the Fifth Amendment.

ue (which by itself does not constitute a taking), the Court must assess the nature of the governmental action, the economic impact of the regulation on each plaintiff, and the extent to which the challenged regulation has interfered with each plaintiff's distinct investment-backed expectations. *Penn Cent. Transp. Co.*, 438 U.S. at 124, 98 S.Ct. 2646; *Forest Props.*, 39 Fed.Cl. at 68. The latter two of these considerations are plainly plaintiff-specific, requiring individualized factual findings for each claimant. The factual intensity of a regulatory takings claim pertains not only to the quantum of damages that each plaintiff claims but also to the very question of whether or not a particular governmental action has effected a compensable Fifth Amendment taking as to each plaintiff. Nevertheless, prior to making a detailed fact finding on these matters, this Court can point out several difficulties with the plaintiffs' claims.

First, the courts have long recognized that regulatory action readjusting the benefits and burdens of public health and welfare generally does not effect a taking.

> A prohibition simply upon the use of property for purposes that are declared, by valid legislation, to be injurious to the health, morals, or safety of the community, cannot, in any just sense, be deemed a taking or an appropriation of property for the public benefit. Such legislation does not disturb the owner in the control or use of his property for lawful purposes, nor restrict his right to dispose of it, but is only a declaration by the state that its use by any one, for certain forbidden purposes, is prejudicial to the public interests.

*Mugler v. Kansas*, 123 U.S. 623, 668–69, 8 S.Ct. 273, 31 L.Ed. 205 (1887). *See also Andrus v. Allard*, 444 U.S. 51, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979); *Goldblatt v. Hempstead*, 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962); *Miller v. Schoene*, 276 U.S. 272, 48 S.Ct. 246, 72 L.Ed. 568 (1928); *James Everard's Breweries v. Day*, 265 U.S. 545, 44 S.Ct. 628, 68 L.Ed. 1174 (1924); *Hadacheck v. Sebastian*, 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915).

There is no real argument that tobacco use is extremely injurious to the public health.

Even the Supreme Court has acknowledged that the FDA had "amply demonstrated that tobacco use, particularly among children and adolescents, poses perhaps the single most significant threat to public health in the United States." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 161, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000). The plaintiffs do not deny the devastating impact of smoking on public health. The FDA tobacco regulations were aimed at addressing this threat. Such regulations would appear to fall within the ambit of *Mugler* and its progeny.

Second, it is difficult to imagine that the plaintiffs had a reasonable investment-backed expectation that they would indefinitely be able to place their machines where children could access them. Every state in the nation has outlawed the sale of cigarettes to children. *See* 60 Fed.Reg. at 41,315. Additionally, the Federal Government has "incrementally expanded its regulatory scheme for tobacco products," and has enacted six separate pieces of legislation addressing tobacco use and health since 1965. *Brown & Williamson*, 529 U.S. at 137–38, 153, 120 S.Ct. 1291. *See* Federal Cigarette Labeling and Advertising Act, Pub.L. No. 89–92, 79 Stat. 282 (1965); Public Health Cigarette Smoking Act of 1969, Pub.L. No. 91–222, 84 Stat. 87 (1969); Alcohol and Drug Abuse Amendments of 1983, Pub.L. No. 98–24, 97 Stat. 175 (1983) (codified at 42 U.S.C. §§ 290aa *et seq.*); Comprehensive Smoking Education Act, Pub.L. No. 98–474, 98 Stat. 2200 (1984); Comprehensive Smokeless Tobacco Health Education Act of 1986, Pub.L. No. 99–252, 100 Stat. 30 (1986) (codified at 15 U.S.C. §§ 4401 *et seq.*); Alcohol, Drug Abuse, and Mental Health Administration Reorganization Act, Pub.L. No. 102–321, 106 Stat. 323 (1992) (codified at 42 U.S.C. §§ 300x *et seq.*). Accordingly, "[t]hose who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end." *Connolly*, 475 U.S. at 227, 106 S.Ct. 1018 (quoting *FHA v. The Darlington, Inc.*, 358 U.S. 84, 91, 79 S.Ct. 141, 3 L.Ed.2d 132 (1958), *reh'g denied*, 358 U.S. 937, 79 S.Ct. 310, 3 L.Ed.2d 311 (1959));

*Branch v. United States,* 69 F.3d 1571, 1579 (Fed.Cir.1995), *cert. denied,* 519 U.S. 810, 117 S.Ct. 55, 136 L.Ed.2d 18 (1996).

Third, it may be fair to force some of the economic costs of the tobacco regulation upon those who have profited from the business. By the plaintiffs' own account, tobacco vending machines have been used in the United States for more than 50 years. Am. Compl. ¶ 4. The costs of preventing children and adolescents from using tobacco products is unavoidable. While this Court is not comfortable ruling on this issue as a matter of law at this time, it may be fair to place a portion of the burden of preventing tobacco use by children and adolescents upon those who have profited from such use. *See Branch,* 69 F.3d at 1579–80. Vending machines provide children and adolescents easy access to tobacco products, and vending machine owner/operators would have profited from such use.

Such discussions and concerns aside, however, this Court must dismiss the plaintiffs' Amended Complaint because of the FDA's lack of authority to regulate tobacco in the first instance, and, in the alternative, because the relevant FDA tobacco vending machine regulations never went into effect.

## CONCLUSION

For the foregoing reasons, the Defendant's Partial Motion to Dismiss Count I of the Amended Complaint is GRANTED. Because Count II of the Amended Complaint was previously dismissed in all the consolidated cases on March 15, 2001 and on April 13, 2001, these cases shall now be dismissed in their entirety. The Clerk of the Court is instructed to enter final judgment for the defendant and to dismiss the plaintiffs' Amended Complaints in all of the consolidated cases.

Each party is to bear its own costs.